IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 3, 2005 Session

## STATE OF TENNESSEE v. HERMAN PARHAM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07973    Chris Craft, Judge**

---

**No. W2004-00059-CCA-R3-CD  - Filed September 27, 2005**

---

The defendant, Herman Parham, was convicted of two counts of second degree murder.  The trial court merged the convictions and imposed a sentence of twenty-five years.  In this appeal, the defendant asserts that the evidence is insufficient to support the conviction, that the trial court erred by instructing the jury on flight, and that the sentence is excessive.  The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert L. Parris, Memphis, Tennessee, for the appellant, Herman Parham.

Paul G. Summers, Attorney General & Reporter; David E. Coenen, Assistant Attorney General; and Jennifer Nichols, James Lammey, and Tom Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

On April 14, 2002, the eleven-year-old victim, Damien Woodard, was shot and killed while playing football with his father on the playground at the Oak Park Apartments in Memphis.  The defendant later admitted being involved in the shooting, explaining that it occurred as a result of a conflict he had with an individual named Christopher Williams.

Daniel "Moonhead" Muhammad, who had known both the defendant and his brother, Patrick Parham, for approximately three years, testified that early on the day of the shooting he saw Patrick Parham driving the defendant's white Crown Victoria near the Oak Park Apartments.  Muhammad recalled that as Patrick Parham stopped to speak to him, an individual named Michael Williams approached the car.  According to Muhammad, he warned Patrick Parham to leave because Michael Williams might "try something" and as he did so, Michael Williams "cocked his pistol and . . .

started shooting" at the car. Muhammad, who lived across the street from the apartments, testified that later that same day, he saw "cars go in the back drive" of the complex. At that point, Muhammad began walking toward the apartments and was confronted by two men, one of whom was armed with a pistol. Muhammad testified that when the individual with the gun asked if he knew anyone named "Moonhead," he responded in the negative because he feared for his life. Muhammad stated that the men left and he went to a friend's apartment.

Muhammad testified that shortly thereafter, he received a telephone call from Patrick Parham, who asked, "[T]ell me the truth[,] did you set me up?" Muhammad denied having done so and Patrick Parham hung up the telephone. Muhammad then returned to his residence, where he later heard that a shooting had taken place at the Oak Park Apartments. After hearing the news, Muhammad returned to the apartments and saw "a little boy" lying on the ground. According to Muhammad, the defendant telephoned him later in the evening and said, "[S]omebody's going to pay for my car," to which Muhammad responded, "[A] little boy got shot," before hanging up on the defendant.

LaRhonda Murphy, who was a resident of the Oak Park Apartments, testified that on the day of the offense, the weather was nice and "a lot of people were outside." She testified that early that day she saw Michael Williams shooting at Patrick Parham. Ms. Murphy recalled that at approximately 6:00 p.m., she walked to the parking lot with her mother and brother and spoke to a friend. While she was in the parking lot, Ms. Murphy noticed the crowd of adults and children running and then saw the defendant standing nearby holding a gun. According to Ms. Murphy, the defendant ordered Christopher "Weedy" Williams, a brother to Michael Williams, to "[C]ome here," and when Christopher Williams fled, the defendant fired several shots in his direction. Ms. Murphy testified that the defendant's cousin, Jeremy Parham, was also in possession of a gun and that he also fired his weapon.

Herman Sallie, who was charged with facilitation of first degree murder in the death of the victim, testified that on the day of the offense, he drove from his residence to the Clayborn Homes, where the defendant's mother resided. Sallie stated that he was walking toward the basketball court when he saw Patrick Parham drive by in the defendant's white Crown Victoria. According to Sallie, he left but returned a short time later and found the defendant, who was angry because someone had shot his car while Patrick Parham was driving near the Oak Park Apartments. Sallie testified that the defendant told him that he was going to "get some guns" and asked Sallie to meet him at his mother's house. Sallie stated that he encountered Izeal Jones, who asked to go with him. When they arrived at the defendant's mother's residence, Sallie saw the defendant, Patrick Parham, Jeremy Parham, Travis Curry, and Patrick Brown in a green Grand Marquis and overheard the defendant's mother say, "[D]on't leave the house because the police ha[ve] already been notified about the car getting shot." He recalled that the defendant responded that he was going to kill the person who shot his car. At that point, Sallie, the defendant, Jones, Rodicus Johnson, and Derrick Crumpton got into Sallie's teal green Cutlass. Patrick Parham, Jeremy Parham, Curry, and Brown were in the Grand Marquis. The two cars left the residence with Sallie's car in the lead. They stopped briefly at a house where the defendant talked to some men on the front porch in an unsuccessful effort to get an

"AK-47." According to Sallie, when they saw a police cruiser, the defendant directed him to stop the car, got out, walked a short distance, and got into Brown's car.

Sallie testified that when they reached the Oak Park Apartments, Johnson got out of his car and it "kind of dawned on [him] what was going on." He claimed that he told Johnson that he did not want to sit in the parked car because "somebody could come back and run and start shooting and [he didn't] have any guns . . . any kind of protection." He also expressed concern that his car was particularly recognizable because of its unique paint job. Sallie stated that he, Crumpton, and Jones left, stopping at a nearby residence so that Jones could speak to the resident about buying a car. According to Sallie, he remained in the car while Jones went inside the residence and Crumpton walked down the street. Sallie stated that when he heard gunshots approximately fifteen minutes later, Jones ran to the car and the two men drove away. Sallie testified that he picked up Johnson and the defendant, both of whom were running from the direction of the Oak Park Apartments. Sallie recalled the defendant saying, "I think I emptied my clip," and Johnson say, "I think I hit his little brother." According to Sallie, one of the other occupants of the car asked, "[H]ow do you know you hit somebody?" The defendant responded, "[W]e was hitting the sh** out of them people." Johnson then said, "I saw a boy laying on the ground and a lady ran over to him."

After the shooting, Sallie drove back to the Clayborn Homes, where Johnson and the defendant got out of the vehicle. He then drove to a park to drop off Jones and Crumpton. Sallie testified that while he was at the park, he saw Brown talking to another individual. According to Sallie, he heard Brown say that "he didn't really see what was happening" and that he "was hearing gunshot[s]" and dropped his gun while trying to jump over a fence. Sallie testified that upon hearing this, he drove back to the defendant's mother's residence, where the defendant was standing outside, and asked the defendant what had happened. He remembered that the defendant explained "that everybody was shooting and that he chased the dude who [was] supposed to ha[ve] shot his car . . . but he missed him." Sallie testified that when he saw three police cars driving toward the residence, he got into a car with his sister, who happened to be driving by. He returned to the defendant's mother's residence a short time later, got into his own car, and drove home.

Sallie testified that he learned later that night from a television news report that the victim had been killed. He stated that he reported the news to the defendant and, on the following day, received a telephone call from Jones, who informed him that he had made a statement to the police. At Jones' suggestion, he telephoned a Lieutenant McMahan and provided a statement. Sallie confirmed that he had been charged with facilitation of first degree murder in the victim's death. He explained that he had chosen to testify to "clarify things" and that he had not been promised anything by the state in exchange for his testimony.

Regina Lee, a resident of the Oak Park Apartments, testified that she was visiting her sister's house across the street when she saw two black men get out of two cars that had been driven behind the complex. She stated that the lighter-skinned of the two men remarked that he was going to "take care of some business over there," and then pulled out a gun and ran toward the sandbox at the apartment playground. Ms. Lee testified that she became frightened because her sister's children

were playing at the sandbox and drove with her sister toward the playground. Ms. Lee stated that when she heard five or six gunshots, she got out of the vehicle, ran to the playground, and saw the victim lying under a tree.

Christopher Williams testified that early on the day of the shooting, he was with Muhammad when Patrick Parham drove up in the defendant's white Crown Victoria, parked the car, and sat on the hood. He recalled that as his brother, Michael Williams, approached him, Patrick Parham drove away at a high rate of speed and, as he slowed down at the mailbox, was shot at by Michael Williams. Williams testified that later that day, he was standing near the sandbox at the apartment complex when he heard someone shout his nickname, "Weedy." When he turned around, he saw the defendant, Patrick Parham, and another black male walking in his direction. He recalled that he took a few steps toward the men but fled when he noticed that they were armed. He stated that when he began to run, "they start[ed] firing." Williams, who claimed that he did not have a weapon, testified that he "ran out the Willet" and "on South Parkway [he] turned left and . . . ducked down behind a house." He contended that shortly thereafter, he returned to the playground area, where his brother and some others were standing on a walkway. Williams stated that as he joined his brother, he saw the victim, who was lying on the ground, and then learned that he had been killed. He recalled that he had seen the victim and his father playing football on the playground.

Christopher Williams testified that he was arrested after the shooting on an unrelated charge and had been incarcerated with the defendant for a brief time. He claimed that the defendant offered to pay him to keep quiet about the defendant's involvement in the shooting. According to Williams, the defendant said, "[D]on't say nothing in the trial, . . . tell my lawyer that Moonhead was shooting at me [and] I['ll] give you $10,000. I['ll] give you five now, five when you tell my lawyer that Moonhead shot at me." Williams testified that while he initially accepted the offer, he told the defendant several days later that he had not "talked to [anyone] since [he had] been [incarcerated]," and the defendant left. During cross-examination, Williams explained that his brother shot at Patrick Parham because "they are enemies . . . . Same thing happened in 2000. . . that they hadn't got squashed yet."

Izeal Jones, who had known the defendant and Patrick Parham for his entire life, recalled that on the day of the shooting, he was playing at a park near Clayborn Homes when Sallie arrived to take him "to Curley's house." Jones testified that Sallie first drove to the defendant's mother's house, where he picked up the defendant and Johnson, and that at some point during the drive, Sallie stopped the car "to let [the defendant] out because he said [the defendant] saw the police – and [the defendant] got out." According to Jones, Sallie continued on to "Curley's mamma's house," where the following events transpired:

> We got over to Curley's mamma's house, got out of the car. So me and Jonathan, we smoked some weed sitting on the side we smoked, so went in the house. [Sallie] and [Crumpton] they was sitting in the car, they went back to sit in the car and [Sallie] got out of the car and came in the house. So we was in the house and when we c[a]me back out we heard some shots. Heard some shots, went back

in the house, c[a]me back out [of the house] they was sitting in the car in the back seat. . . . [I]t was [Johnson], [the defendant], [Crumpton], and [Sallie].

Jones testified that he got back into the car and as they drove away, he heard either Johnson or the defendant, both of whom had guns, say, "I killed that n****r, one of them n****rs is dead." Jones stated that he asked Sallie to drop him off because he didn't want to be involved. He recalled that the defendant asked him to "hold the gun" but he refused, got out of the car, and walked away. Jones testified that two days later, he learned that the police were looking for him, so he went to the police station and provided a statement. During cross-examination, Jones acknowledged that the defendant did not appear angry when he first got into Sallie's car.

Joe Edward Hill, Jr., who was at the Oak Park apartments on the day of the shooting to do a tattoo for a woman who lived there, testified that as he stood in the parking lot, the defendant and another man, both of whom were armed, walked up and the defendant asked if Hill had seen "Humphead," who he claimed had shot his car. According to Hill, the two men walked toward the playground "in a gangster like 'f*** the world' mode." Hill recalled that the defendant then shouted, "[H]ey, little n****r," and began firing his gun in a "sweep motion" from right to left. Hill testified that the victim "was hit" and that "the way [the defendant] swung the gun shooting. . . ended up over where the [victim] was." According to Hill, the defendant and the other man "stood over" the victim before running away and that as they ran by, the defendant said, "[Y]a'll know where we're at, tell them where we're at." Hill testified that when he saw blood on the victim's arm, he used his cellular telephone to call 911.

Dedrick Phillips, a resident of the Oak Park Apartments, testified that early on the day of the offense, he heard gunshots, heard Christopher Williams and another man "bragging that they ran somebody off shooting at them," and then turned to see the back of a white Crown Victoria being driven away. Phillips recalled that the driver of the Crown Victoria shouted that he would "be back." Phillips recalled that later that afternoon, he was standing outside talking to a girl when he heard "shots just ring out" without "any kind of warning." He testified that he "didn't stand around to look see what was going on" and ran "around the building" where he saw the victim "dead on the ground." Phillips recalled that he saw three men with guns but only recognized the defendant, whom he knew as "Baby Red." According to Phillips, all three of the men were shooting. He stated that "at first it seemed like they were shooting at Weedy, but he . . . ran and they just kept shooting." Phillips stated that when the gunfire ended, he saw the three men standing over the victim.

Tyrus Moore, who was also a resident of the Oak Park Apartments, testified that on the day of the shooting, he walked to a nearby store to purchase chips and a drink and when he returned a few minutes later, he heard a single gunshot. He recalled that he was confronted by two men with handguns, one of whom he recognized as the defendant. He testified that the defendant pointed the gun at him and said, "Bitch, you got something to do with this too?" Moore, who explained that he was paralyzed with fear and was unable to respond, stated that the men stood in front of him for approximately ten seconds before running away. Shortly thereafter, Moore saw Christopher Williams, who was unarmed, running through the complex.

The victim's father, Essie L. Moore, Jr., testified that on the day of the offense, he was playing football on the playground with the victim and several other children. He recalled that "the playground was full, the sandbox was full, [there were] kids riding their bikes." Moore, who had gone to sit on his porch, heard what sounded like firecrackers and turned to see people running up a walkway followed by three men "chasing some dude." According to Moore, the victim was shot in the head as he chased a football that had rolled down a hill. He testified that he ran to the victim and placed his finger over a hole in his head in an effort to stop the bleeding. Moore, who recalled that the entire incident lasted only about a minute, stated that he was unable to identify the gunmen.

Officer William Acred of the Memphis Police Department, who responded to the call that shots had been fired at the Oak Park Apartments, testified that he found the victim lying "underneath a tree shot in the head surrounded by his parents." The officer stated that he tried to preserve the scene, attempted to get a description of the suspect, and called for backup. He described the crime scene as "chaotic," with some thirty to forty people milling around the area.

Officer Marcus Berryman, a crime scene investigator with the Memphis Police Department, testified that approximately twenty officers responded to the scene. The officer took photographs and helped homicide detectives look for and document evidence. He stated that he collected a total of six spent shell casings, two of which were from .380 caliber and four of which were .45 caliber. One of the .380 shell casings was discovered just in front of the tree where the victim was found.

Dr. Teresa Allen Campbell, who performed an autopsy of the victim, testified that the cause of death was a single gunshot wound to the head. According to Dr. Campbell, the bullet entered the victim's forehead "about 0.35 inches to the right of midline" and then went "into the right front lobe of the brain, and then it went into the right ventricle of the brain . . . . the basal ganglia, the thalamus of the brain, then it went into the right perietal lobe of the brain . . . . then it went through the right occipital lobe of the brain, . . . and then it exited through the skull bone where two of the skull bones come together." She testified that the bullet exited the victim's skull "a little bit more to the right of midline 0.7 inches." Dr. Campbell testified that there was no stippling on the entrance wound, leading her to conclude that the shot was fired from more than two feet away. According to Dr. Campbell, she could not definitively determine whether the shot came from a .380 or a .45 because the width of the entrance wound was .4 inches, a size which could have been caused by either weapon.

Heath Barker, a Firearms Identification Specialist with the Tennessee Bureau of Investigation, testified that he performed an examination of the shell casings collected from the crime scene. He concluded that two of the Remington-Peters (RP) .380 casings were fired from one firearm, two of the RP .45 casings were fired from a second firearm, and the remaining two RP .45 casings were fired from a third firearm. All were fired from semi-automatic weapons. During cross-examination, Barker testified that the diameter of a .45 caliber bullet is .441 inches and that the diameter of a .380 caliber bullet is .347 inches.

Margaret West, a resident of the Oak Park Apartments, testified on behalf of the defendant. She stated that at approximately 6:00 p.m. on the day of the shooting, she was standing outside talking to a neighbor when she heard gunfire. Ms. West recalled seeing at least four or five young black men with handguns running through the complex. Ms. West identified one of the armed individuals as Michael Williams.

Cameron Knighten, a Sergeant with the Shelby County Training Center, testified that both the defendant and Christopher Williams were housed in her unit from February until May of 2001. She stated that she never saw any animosity between the two during that time. Delores Houston, another employee of the Shelby County Training Center, also testified that there was no animosity between the defendant and Christopher Williams during their incarceration together.

The defendant testified that he had known Michael and Christopher Williams since 1999 and that in 2000, Michael Williams and some others burglarized his mother's residence. The defendant claimed that after he learned of Michael Williams's involvement in the burglary, they were "arguing every day . . . then it got to a point where [they] had settled it." According to the defendant, Michael Williams was arrested in 2000 after he brandished a gun at the defendant at the Oak Park Apartments. He contended that when Michael Williams was released from jail, the two young men agreed to meet in the middle of a park to settle the dispute. The defendant testified that both he and Michael Williams were armed on the day that they met and that they reached an agreement to end the feud. He stated that during the following year, he was housed with Christopher Williams at the Shelby County Training Center and the two never had any disputes. He explained that Michael Williams was housed in a different unit but that the two interacted at meals and other group activities and that there were no problems between them.

The defendant testified that at the time of the shooting, he went to the Oak Park Apartments every day to shoot dice. He stated that on the day of the offense, he was at his brother's residence taking a nap when his brother woke him and informed him that Michael Williams had tried to shoot him. The defendant testified that he saw a bullet hole in his car and, angered because his mother or young daughter could have been hurt had they been inside the car, took his gun and went to his mother's residence in the Clayborn Homes. The defendant stated that he asked Sallie, who was standing near his mother's house, to drive him to the Oak Park Apartments so that he could confront Michael Williams. The defendant claimed that Johnson and Crumpton asked if they could accompany him and denied "rounding them up." He testified that Jones also accompanied them and that Brown, Curry, Jeremy Parham, and Patrick Parham followed in another car. According to the defendant, when he saw a police car as they were driving toward the apartments, he got out of Sallie's car, walked down the street a short distance, and then got into the car being driven by Brown.

The defendant testified that when they arrived at the Oak Park Apartments, he told the others to stay in the car because he was "fixing to go and see what's going on." He stated that as he walked along the sidewalk, he noticed that Johnson was behind him. He explained that he did not tell Johnson to leave because he "knew he was only there for [his] protection." The defendant testified that when he saw Christopher Williams, he shouted, "[C]ome here, Chris." According to the

defendant, Christopher Williams "took about three or four steps" and then "stopped and . . . shot at [him]." The defendant claimed that he shot back in self-defense and that he fired his gun only twice. The defendant maintained that while some children were playing nearby, none were in his line of fire. He stated that as soon as he had fired the shots, he "struck out running" back toward Sallie's car. The defendant claimed that he heard approximately sixteen more gunshots as he ran away.

The defendant testified that he ran back to the parking lot, got into Sallie's car, and was driven to his mother's house. He stated that later that evening, he left his mother's residence and joined a dice game that was being played in "the cut" at the Clayborn Homes. The defendant claimed that he first learned that the victim had been shot when a friend named Angie telephoned him while he was playing dice. He testified that upon learning of the victim's death, he paid "a junkie" to drive him to a motel and then called his mother to ask her to visit him. According to the defendant, his mother was angry because Patrick Parham had been arrested in connection with the victim's death and she told him that she was going to tell the police where he was hiding. He testified that he then moved to a different motel, where he received a call on his cell phone from Lieutenant McMann and agreed to turn himself in to the police. The next morning, the defendant telephoned Lieutenant McMann and informed her that he was going to his mother's residence and that the police could find him there. He stated that he found out that the victim had died when he watched the news. The defendant denied going to the complex to kill Michael Williams, contending that he "was going over there like in 2000 to see Mike, ask him was there a problem or whether it was a mistake, what was going on, why did he shoot at [his] brother, shoot at [his] car."

During cross-examination, the defendant acknowledged that he was angry because he believed Michael Williams had tried to kill his brother and had been assisted by Muhammad. He nevertheless claimed that he was calm when he asked Sallie to drive him to the Oak Park Apartments and denied telling Sallie that "someone was going to die." He conceded that he armed himself with a .45 caliber semi-automatic handgun but claimed that his intention was only to speak with Michael Williams. The defendant denied threatening Tyrus Moore with a gun and denied having a conversation with Hill. He claimed that he did not see the victim or any other children playing football and that Christopher Williams was surrounded by ten male companions rather than one female. The defendant admitted telling detectives that he had chased Christopher Williams but contended that he made the admission only because he was pressured by the detectives. He stated that he was scared when he was being interviewed by the police because "[t]hey acted like [he] had killed the President." The defendant acknowledged that he had lied to police when he told them that he had given his gun to his cousin, Santangela Parham.

Sergeant James Fitzpatrick of the Memphis Police Department, who was called as a rebuttal witness, testified that he took a statement from the defendant. The defendant's statement was then read into evidence by the Sergeant. In the statement, the defendant admitted being present when the victim was shot but denied responsibility saying, "[I]t's a strong possibility that Rodriguez Johnson a/k/a Rod shot [the victim]."

I

The defendant first asserts that the evidence is insufficient to support his conviction. He specifically contends that there was insufficient proof that he was the person who fired the fatal shot or that he was criminally responsible for the shooting. The state submits that the evidence is sufficient.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Tenn. Code Ann. § 39-11-106(a)(20). Tennessee Code Annotated section 39-11-401 provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Under the circumstances of this case, the defendant could be held criminally responsible for the conduct of another if:

> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2).

The evidence adduced at trial, viewed in the light most favorable to the state, established that early on the afternoon of the offense, Michael Williams fired a number of gunshots at the defendant's white Crown Victoria while Patrick Parham was driving near the Oak Park Apartments. When Patrick Parham informed the defendant of the incident, the defendant, angered that his car had been damaged, armed himself and assembled eight others, Sallie, Brown, Curry, Johnson, Jones, Crumpton, and Patrick and Jeremy Parham, to accompany him to the Oak Park Apartments to confront Michael Williams. Sallie testified that the defendant had expressed an intention to kill the person who had shot his car. Muhammad recalled overhearing the defendant say that the person who

had damaged his car would "pay." Upon arriving at the apartment complex, the defendant and Johnson drew their guns and ran toward the playground. Several witnesses confirmed that the defendant had a gun in his hand while going through the complex. When he saw Christopher Williams, the defendant ordered him to "come here" and opened fire. Although the defendant contended that Christopher Williams fired the initial shots, several witnesses testified that Christopher Williams was unarmed. The defendant admitted that he fired his .45 caliber handgun and while he denied firing in the direction of the victim, the jury was free to disregard any portion of his testimony. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). Christopher Williams testified that the defendant "emptied his clip" while shooting "gangster style" in a sweeping motion. Hill confirmed that the defendant shot in the direction of the victim. The defendant admitted that Johnson, who had traveled to the apartments at the defendant's request, had also fired his gun during the incident. In his statement to police, the defendant acknowledged that there was "a strong possibility" that Johnson had fired the fatal shot. Dr. Campbell testified that the victim's wound could have been caused by either a .380 or a .45. Under either the theory of direct responsibility or criminal responsibility, it is our view that the evidence was sufficient to support the conviction for second degree murder. See State v. Lemacks, 996 S.W.2d 166, 171 (Tenn. 1999) (holding that the crucial point is all jurors unanimously agreed the defendant was guilty of the single offense charged even if some found criminal responsibility and others based their verdict on direct liability).

II

The defendant next contends that the trial court erred by providing a jury instruction on flight. The state submits that the defendant waived any challenge to the jury instructions by failing to make a contemporaneous objection. See Tenn. R. App. P. 36(a). In the alternative, the state asserts that the instruction was proper.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30. "In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence to support such an instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). Our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." Berry, 141 S.W.3d at 588.

In this case, Hill and Phillips testified that the defendant and his companions stood briefly over the victim's fallen body before they fled from the complex. Sallie testified that the defendant ran to his car after the gunfire and asked to be driven to his mother's residence. While at his mother's residence, the defendant encountered the police but said nothing about the shooting at the Oak Park Apartments, even as his brother was arrested. The defendant left his mother's residence to play dice and, upon learning that the victim had been shot, asked "a junkie" to drive him to a nearby motel

-10-

even though he could have driven his own car. The defendant admitted that he changed motels because he feared that his mother would alert the police to his whereabouts. In our view, the evidence at trial established both a "leaving the scene" and a "hiding out" sufficient to warrant an instruction on flight. In consequence, the trial court did not err by providing the instruction.

III

As his final complaint, the defendant asserts that the sentence is excessive. He contends that the application of several of the enhancement factors violates the requirements of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004).

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

The presumptive sentence for second degree murder, a Class A felony, is the midpoint in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the presumptive term. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the presumptive term. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

As indicated, the defendant's only challenge to the sentence is that the application of the enhancement factors violates the requirements of Blakely. This court had previously held that the United States Supreme Court's opinion in Blakely called into question the continuing validity of our current sentencing scheme. See, e.g., State v. Michael Wayne Poe, No. E2003-00417-CCA-R3-CD (Tenn. Crim. App., at Knoxville, July 19, 2004), perm. app. denied (Tenn. Dec. 20, 2004). In that

-11-

case, the Court, applying the rule in <u>Apprendi v. New Jersey</u>, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>." <u>Blakely</u>, 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a <u>right</u> to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." <u>Id.</u> at 2543.

Recently, however, in <u>State v. Gomez</u>, a majority of our supreme court held that "[u]nlike the statutes at issue in <u>Blakely</u> and <u>Booker</u>, a judicial finding of an enhancement factor in Tennessee does not affect the range of punishment to which a defendant is exposed." 163 S.W.3d 632, 659 (Tenn. 2005). It is our view that the holding in <u>Gomez</u> does not permit any relief.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-12-